In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 04-3890

GREGORY SHELL,

Petitioner-Appellant,

v.

UNITED STATES OF AMERICA,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 3182—**Harry D. Leinenweber**, *Judge.*

_____

ARGUED FEBRUARY 21, 2006—DECIDED MAY 23, 2006

_____

Before MANION, WOOD, and EVANS, *Circuit Judges.*

MANION, *Circuit Judge.* Gregory Shell is serving a term of life imprisonment after being convicted for his leadership role in the Gangster Disciples. The government obtained overwhelming evidence against Shell by monitoring his conversations with Larry Hoover, the chieftain of the Gangster Disciples, who was serving time in prison for murder. Shell filed a motion for relief under 28 U.S.C. § 2255, which the district court denied. We granted a certificate of appealability on the issue of whether Shell's counsel was constitutionally ineffective for not raising certain challenges at his trial. We now affirm.

I.

Gregory Shell was second-in-command of the Gangster Disciples ("GDs" or the "gang") in Chicago, a gang that had a $100,000,000 per year drug business.[1] The founder of the gang, Larry Hoover, had been convicted of murder in 1973, but he retained his leadership position in the GDs from his prison cell in Vienna, Illinois. To maintain order in his absence, Hoover designated Shell as his proxy in 1992, giving him day-to-day control over the gang's operations in Chicago. Shell, a trusted board member who had not been incarcerated, brought a flair for organization to the gang's dealings, efficiently coordinating and systematizing the GD drug network. During Hoover's time in jail, he would often talk to different GD lieutenants over the telephone, but, if the conversation turned to gang business, he would tell his interlocutor to come to Vienna personally. Over a period of ninety months in the late 1980's through the mid 1990's, Shell made the trip from Chicago to Vienna, which is in the most southern part of Illinois, over one hundred times.

In 1993, a DEA task force began investigating Hoover's continuing role with the GDs. The task force applied to Chief Judge Moran of the Northern District of Illinois for a warrant for electronic surveillance, as required by 18 U.S.C. § 2518 ("Title III"). Title III requires applicants for such a warrant to submit a statement, under oath, containing a variety of disclosures, including "(ii) . . . a particular description of the nature and location of the facilities from

---

[1] We refer readers to previous decisions, such as *United States v. Hoover*, 246 F.3d 1054 (7th Cir. 2002), and *United States v. Smith*, 223 F.3d 554, 568-69 (7th Cir. 2000), for further discussion of the GDs' nefarious dealings.

which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted." 18 U.S.C. § 2518(1)(b). In this case, the application sought a warrant "authorizing the [DEA] and other law enforcement personnel assisting them to intercept oral communications occurring at the Visitor Area [of the Vienna Correctional Facility], between Larry Hoover and Gregory Shell, [and assorted other GD members]." The application was devoid of any information describing the means that the DEA intended to employ. Chief Judge Moran authorized the surveillance.

All visitors to the prison had to wear a badge identifying themselves as such. Working with prison officials, the DEA conducted the authorized surveillance of the conversations in the Visitor Area by placing an electronic eavesdropping device (the "bug") inside the badge given to Hoover's visitors. This enabled the DEA to listen to Hoover's communications with Shell and his other GD visitors, no matter where in the Visitor Area they occurred. The bug turned up a wealth of information, leading to a forty-two- count indictment against Hoover, Shell, and various other GD leaders for their involvement in the gang's drug activities.

Before trial, Shell filed a motion to suppress, raising a variety of challenges to the Title III application and warrant.[2] The district court denied the motion. Shell then

---

[2] Shell now claims his counsel was ineffective because he did not raise several issues in his motion to suppress. Specifically, Shell's counsel did not contend that the interception of his oral communications with Hoover amounted to an infringement on his

(continued...)

went to trial and was convicted, and we affirmed. *See Hoover*, 246 F.3d at 1063.

In 2003, Shell filed a timely motion under 28 U.S.C. § 2255 asserting that the bug in the badge amounted to a Fourth Amendment violation and that his counsel was constitutionally ineffective for not raising this argument. The district court denied this motion. We subsequently granted a certificate of appealability on three issues: "Whether trial and appellate counsel were ineffective for failing to argue that (1) the intercepted conversations were obtained in violation of the Fourth Amendment; (2) the trial court erred when it admitted intercepted conversations because the court order did not specify where the communications would be intercepted; and (3) the court order was void because the government deliberately omitted material information regarding the method of interception when it asked for authorization, and the judge would not have authorized the surveillance if he had known the method."

II.

We review the district court's decision to deny Shell's § 2255 motion de novo. *See Kitchen v. United States*, 227 F.3d 1014, 1017 (7th Cir. 2000); *see also Fountain v. United States*, 211 F.3d 429, 433 (7th Cir. 2000). "A § 2255 motion must be granted when a defendant's 'sentence was imposed in violation of the Constitution or laws of the United States.'"

---

[2] (...continued)
Fourth Amendment rights. Nor did he argue that the application to intercept oral communications was insufficient because it did not explain the alleged constitutional difficulties inherent in the surveillance.

*Fountain*, 211 F.3d at 433 (quoting 28 U.S.C. § 2255). As the certificate of appealability was limited to Shell's challenge to the constitutionality of his representation, *see id.*, we conduct our review in light of the test first annunciated by *Strickland v. Washington*, 466 U.S. 668, 688-94 (1984). *See, e.g.*, *Kitchen*, 227 F.3d at 1019; *Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996). The familiar standard of *Strickland* requires a showing that: (1) Shell's counsel was objectively deficient; and (2) this deficient performance so prejudiced his defense that Shell was deprived of a fair trial. *See Fountain*, 211 F.3d at 434; *see also Prewitt*, 83 F.3d at 816.

Turning to the first prong, a constitutionally deficient performance is one that falls below an objective standard of reasonableness under prevailing professional norms. *See, e.g.*, *Granada v. United States*, 51 F.3d 82, 83 (7th Cir. 1995). In the Supreme Court's words, "a court must indulge a strong presumption that counsel's conduct falls within the range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see also Galbraith v. United States*, 313 F.3d 1001, 1008 (7th Cir. 2002). "[B]ecause counsel is presumed effective, a party bears a heavy burden in making a winning claim based on ineffective assistance of counsel." *Fountain*, 211 F.3d at 434 (quoting *United States v. Trevino*, 60 F.3d 333, 338 (7th Cir. 1995)). Generally, failing to pursue a particular issue is not deficient performance, but such a conclusion depends on the attorney's reasoning (or lack thereof). *See Kitchen*, 227 F.3d at 1020. "When the claim of ineffective assistance is based on counsel's failure to present a motion to suppress, we have required that a defendant prove the motion was meritorious." *United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005); *see also Owens v. United States*, 387 F.3d 607, 610 (7th Cir. 2004).

Shell claims his attorney was ineffective because he failed to present several valid arguments in the motion to sup-

press. Against this backdrop, we consider the arguments Shell believes his attorney should have made. Specifically, Shell contends that his attorney should have argued the interception of the communications constituted both an unreasonable seizure and an unreasonable search of his body in violation of the Fourth Amendment. Shell further claims his attorney should have argued that the Title III application and warrant failed to specify the location of the search with requisite particularity. Finally, he asserts that his attorney was ineffective because he failed to argue that the government omitted material information regarding how the search was to be conducted, thus transforming Chief Judge Moran into a rubber stamp.

A.

We begin our analysis by considering Shell's two Fourth Amendment challenges. Shell first contends that the government seized his body through the placement of the bug in his visitor's badge. "A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority . . . in some way restrained the liberty of a citizen.' " *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968)); *see also United States v. Hendricks*, 319 F.3d 993, 999 (7th Cir. 2003); *United States v. Thompson*, 106 F.3d 794, 798 (7th Cir. 1997). Rather than explaining the alleged seizure of his person using this well-established framework, Shell roots his argument in Fourth Amendment precedent regarding seizures of property. *See United States v. Karo*, 468 U.S. 705, 712 (1984) ("A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property.") (internal citations omitted). Shell offers no support for

deploying this characterization of a seizure in this case. As Shell has failed to show that DEA agents in any way restrained his liberty, he has not established an illegal seizure for Fourth Amendment purposes.

We now turn to Shell's claim that the DEA's actions in bugging his badge constituted an unconstitutional search. "As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *See Kyllo v. United States*, 533 U.S. 27, 33 (2001). One must first have a legitimate expectation of privacy to trigger the protections of the Fourth Amendment. *See Hudson v. Palmer*, 468 U.S. 517, 525 (1984); *see also United States v. Sababu*, 891 F.2d 1308, 1329 (7th Cir. 1989). To determine reasonableness under the Fourth Amendment, we balance the degree of the intrusion into Shell's privacy interests against the government's need for the search. *See, e.g.*, *United States v. Knights*, 534 U.S. 112, 118-19 (2001). While we cannot say that Shell had no expectation of privacy when visiting Hoover in prison, he did have a greatly diminished expectation of privacy while communicating with a prison inmate. *See, e.g., Sababu*, 891 F.2d at 1329 ("We believe that it was unreasonable for her to expect that telephone calls she placed to an inmate . . . would be private. As the Supreme Court has held, 'in prison, official surveillance has traditionally been the order of the day.' "); *see also Spear v. Sowders*, 71 F.3d 626, 630 (6th Cir. 1995) ("In seeking entry to [a prison], the visitor simultaneously acknowledges a lesser expectation of privacy."); *Romo v. Champion*, 46 F.3d 1013, 1018 (10th Cir. 1995). On the other side of the ledger, the government made a substantial showing in its application for the Title III warrant that the monitoring at Vienna would reveal ongoing GD activity. Balancing the lessened expectation of privacy and the

proffered value of the search, we conclude that this was a reasonable search and did not infringe on Shell's Fourth Amendment rights.

Still, Shell asserts that the search was unreasonable because the placement of the bug was more intrusive than the warrant permitted. As an initial matter, we note that a search does not need to be the least intrusive alternative to be constitutionally valid, it simply has to be reasonable. *United States v. Prevo*, 435 F.3d 1343, 1348 (11th Cir. 2006). In support of his position, Shell compares his situation to the one in *Ybarra v. Illinois*, 444 U.S. 83 (1979). *Ybarra* involved a case in which the police had a warrant to search a bar, and a bartender named Greg, for drugs. *See Ybarra*, 444 U.S. at 90. The police, expanding the warrant's terms, also searched Ybarra, a bar patron, despite having no particularized reason to search him or authorization to do so. *See id*. The Supreme Court found the government's actions to be in violation of Ybarra's Fourth Amendment rights. *See id*. at 92 ("Although the search warrant, issued upon probable cause, gave the officers authority to search the premises and to search 'Greg,' it gave them no authority whatever to invade the constitutional protections possessed individually by the tavern's customers.").

Shell's reference to *Ybarra* is inapt. Shell tries to bring his case in line with *Ybarra* by arguing that, while the warrant authorized the search of the Visitor Area, the government searched his body. Neither characterization of the search is correct. Shell voluntarily wore the badge as part of visitor protocol, and the bug's only function was authorized by the warrant. The Title III application and warrant were directed precisely towards intercepting the communications between these two men, referenced by name, as they discussed gang business in the Visitor Area. This was not a search of Shell's

body (as he puts it). Rather it was an efficient interception of his conversations with Hoover. The Title III warrant expressly sanctioned the interception of Shell's conversations with Hoover, making the search no more intrusive than was authorized. Unlike *Ybarra*, in which the police infringed on Ybarra's independent constitutional rights, in this case the DEA simply did an effective job of precisely what they were allowed to do—intercept conversations between GDs in the Visitor Area. A motion to suppress on these grounds would not have been meritorious, and therefore Shell cannot succeed on an ineffective assistance of counsel claim.

B.

In a closely related argument, Shell asserts that the Title III application and warrant were defective because of a lack of particularity in describing that the search and seizure would be "of Gregory Shell's body." As the Supreme Court has reemphasized in *United States v. Grubbs*, 547 U.S. ___, 126 S.Ct. 1494, 1500 (2006), the Fourth Amendment does not have a general particularity requirement, but merely requires particularity in a warrant's descriptions of the "place to be searched" and the "persons or things to be seized." The Supreme Court repeatedly has resisted attempts to expand this requirement to "unenumerated matters." *Id. See also Dalia v. United States*, 441 U.S. 238 (1979). For example, in *Dalia*, the Supreme Court approved of a Title III warrant that authorized the placement of a bug in a petitioner's office despite the petitioner's particularity challenge on the grounds that it did not specify that the police would use an undercover entry when installing the bug. 441 U.S. at 254-56. The Supreme Court instructed that nothing in the Fourth Amendment requires search warrants

to "include a specification of the precise manner in which they are to be executed." *Id*. at 257.

Shell counters that greater particularity was required in this case because the placement of the bug on his body was a more intrusive search than merely intercepting conversations in the Visitor Area. As noted above, this was not a body search. The only search from the electronic bug was the authorized interception of conversations. Simply calling the surveillance a search of the body does not make the DEA's actions more intrusive than the warrant permitted. *Cf. United States v. Husband*, 226 F.3d 626, 633-36 (7th Cir. 2000).

We agree with the district court that Shell presents a challenge to the method that the police employed to carry out the search, rather than to its intrusiveness. Under *Dalia*, the DEA did not have to include details describing how they would accomplish the search. 441 U.S. at 257. The Title III application and warrant clearly described the place to be searched and the conversations that were to be intercepted, thus identifying, for both the reviewing judge and for the police, the precise location of the interceptions and the privacy interests at stake. This was not a general warrant, in which officers have unwarranted and unconstitutional latitude to conduct an overly broad search. *See Hessel v. O'Hearn*, 977 F.2d 299, 302 (7th Cir. 1992) ("We should not like to be understood that a search warrant gives the executing officers a blank check. . . . Flagrant disregard for the terms of the warrant transforms it into a general warrant, which the Fourth Amendment forbids."). Again, as Shell's argument on this point could not prevail, his previous counsel was not ineffective for not addressing it.

## C.

Finally, Shell argues that, by artfully drafting its Title III application and not including material information about how it planned to intercept the communications, the government effectively rendered the judge's review meaningless. A claim that the government, through acts or omissions, deliberately misled a judge when seeking a warrant is serious, which explains the stringent standard of review in such cases. *See Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). To qualify for a *Franks* hearing to evaluate such an assertion, Shell would have to make a substantial preliminary showing that: (1) the application for the warrant contained false statements or omitted information; (2) the DEA made the false statements or omitted the information intentionally, or with reckless disregard for the truth; and (3) the omitted information was necessary to support the authorization for the search. *Id*. In this case, Shell merely states that the government intentionally omitted that the search would involve the bugging of the badge because of fears that the reviewing judge would otherwise reject the application. Shell offers no support for this contention, instead treating this conclusion as flowing from the fact that the police did not include the information in the application. It was, however, not necessary to include the means of the search in the application. Furthermore, Shell makes no substantial demonstration that the DEA acted dishonestly or with reckless disregard for the truth. Shell's counsel cannot be held ineffective for failing to introduce this unsubstantiated issue.

## III.

While Shell attempts to indict the actions, or lack thereof, of his former counsel regarding a variety of issues, he fails

to show that any have merit. Consequently, we need not proceed to the second prong of the *Strickland* analysis and consider whether any of the alleged failures of his counsel prejudiced him. Shell received adequate representation in his original trial and appeal, and we, therefore, AFFIRM the district court's decision to deny him relief under 28 U.S.C. § 2255.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*